C. M. SMITH AND J. A. SMITH, DOING BUSINESS AS CO-PARTNERSHIP, RESPONDENTS, v. W. M. ALLGIER, APPELLANT.—135 S. W. (2d) 42.

Springfield Court of Appeals. October 30, 1939.

*Merrill Spitler* and *R. F. Baynes* for appellant.

*James V. Conran* for respondents.

TATLOW, P. J.—This is a suit by the respondents, a co-partnership, who, as real estate agents, are seeking to recover a real estate commission for the sale of a cotton gin owned by the appellant. The cause was tried to a jury and resulted in a verdict in favor of the co-partnership.

The petition alleges and seeks to recover upon a special contract of employment, which was in writing, and limited to a period of ten days. It also alleges that, by a further written agreement, on July 1, 1938, the agreement was extended twenty days from that date to July 21, 1938, which last agreement also reduced the amount of the sale price from $17,500 to $16,500, and contains the further allegation:

". . . Complainants say that after the expiration of the said twenty days the defendant agreed in writing, the said instrument being hereto attached, marked plaintiffs 'Exhibit C', and made a part of this

petition the same as though set out in full herein, to extend the said agreement for another 10 days and that during all this time the plaintiffs had continued their efforts to secure a purchaser for the said cotton gin.''

The answer was a general denial.

With reference to the last ten days' extension, the evidence is undisputed that this alleged extension was not made in writing; that, while the respondents requested and sought to obtain a written extension of ten days, the appellant refused to sign the extension. The respondents' evidence tends to show a verbal agreement with reference to an extension. The appellant's evidence tends to show that no such verbal agreement was made. There is a sharp conflict in the evidence with reference to this alleged extension. The evidence with reference to what was or was not done concerning this alleged extension will be referred to later in the course of this opinion.

The contract of employment declared upon in the petition and shown by the evidence, consists of a letter dated June 25, 1938, written by appellant to respondents, and is Exhibit ''A,'' attached to the petition.

A letter dated July 1, 1938, is also a letter written by appellant to respondents, and is Exhibit ''B,'' attached to the petition. In addition to the signature of the appellant to the letter in the following:

''Accepted by

''C. M. & J. A. Smith

''By C. M. Smith, Sr.''

''Immediately following this acceptance, the abstract shows the following:

''(Plaintiff's Exhibit 'C')

''The above agreement is extended for ten (10) days from this date—

''July 21st, 1938.

''To expire August 1st, 1938.

''C. M. & J. A. Smith by J. A. Smith.''

It will be observed that this alleged extension is not signed by the appellant, and, as before stated, the undisputed evidence shows that he refused to sign it.

The abstract, with reference to this extension, shows:

''MR. CONRAN:

''. . . Q. Now, I'll ask you to examine a letter identified as exhibit C and to tell the court and jury what that purports to be and what happened? . . .

''MR. BAYNES: We object to that as we think it speaks for itself.

''THE COURT: Overruled.

''MR. BAYNES: Exception.

''A. This is an agreement to extend this contract for ten days or until July 21st, 1938, and Mr. Allgier failed to put his name to it.

Q. What did he tell you, if anything, at the time he refused to sign that agreement?

"MR. BAYNES: We object to that, they are suing on a written contract and they cannot now prove some oral agreement, their petition pleads a written contract.

"THE COURT: Don't they plead an extension?

"MR. BAYNES: Yes sir, but the witness says the defendant refused to sign this extension.

"THE COURT: Overruled.

"MR. BAYNES: We still contend this is not a written agreement.

"MR. CONRAN: It does not make any difference about this extension, we just want to show what the facts are. This is not necessary to this lawsuit at all, that last extension.

"THE COURT: Objection will be sustained.

"MR. CONRAN: Exception."

A the close of the plaintiff's evidence and at the close of all the evidence in the case, the appellant made a written request that the court direct a verdict in his favor, which request was overruled and exceptions saved.

The main instruction for the respondents submits the case on the theory that, if the property was listed for sale with the respondents, and if the purchaser and appellant were brought together by the respondents and a sale resulted, then the respondents were entitled to recover. The instruction eliminated the time limit fixed in the written extension—at least so far as it related to the meeting of the minds of the purchaser and the seller. The instruction concluded as follows:

". . . ; and the court further instructs the jury that if you find and believe from the evidence that the services of the plaintiffs herein were the procuring cause of said sale, if you so find and believe, then the plaintiffs would be entitled to their commission even though the actual sale was consummated after the termination of the time limit in their contract with the defendant, if you so find and believe, and if you find and believe that the services of the plaintiffs were rendered during the effective period of their contract with defendant."

At the request of the appellant the court gave instruction No. 1:

". . . that unless you believe from the evidence that the plaintiff was the immediate, active and responsible cause of sale to Kohn Brothers of the defendants property, and was the procuring cause of Kohn Brothers and defendant coming together under their offer and acceptance, you must find for the defendant."

The appellant requested the court to give several instructions, in substance as follows: and if you find that on the 21st day of July, 1938, said offer expired; and if you further find that the defendant, after the 21st day of July, 1938, did sell said property to Kohn Brothers, you are instructed that, if you so believe and find the foregoing, then,

under the law, the plaintiffs are not entitled to any commission and your verdict must be for the defendant, W. M. Allgier.

While the abstract, with reference to what the court ruled during the introduction of the evidence as to whether the respondents could or could not recover if the sale was actually made after the time limited in the special contract of employment, is somewhat confusing, the court seems to have ruled that the respondents could recover on an oral contract but the fact that the extension was not signed, made the extension, if it was extended, an oral and not a written agreement. If this is not the correct interpretation of just what the court meant, the court's action in overruling the appellant's request, both at the close of the plaintiffs' evidence and at the close of all the evidence, for a directed verdict, the giving of the main instruction for the respondents and its refusal to give the several instructions requested by appellant, clearly shows that the case was submitted to the jury upon the theory that the respondents were entitled to recover if they brought the parties together on or before the 21st day of July, 1938, and that a sale resulted. This would overrule the appellant's contention that, even if they did bring the parties together on or prior to the 21st day of July, 1938, if the minds of the parties did not meet so as to constitute a sale on or prior to that date, then there could be no recovery.

In our opinion the correctness of this rule determines whether the case should be reversed or whether it should be affirmed—this because the undisputed evidence shows that the minds of the parties (that is, the appellant Allgier as the seller and Kohn Brothers as the purchasers) did not meet so as to constitute a sale on or prior to the 21st day of July, 1938.

The gin at Talipoosa, Missouri, which the appellant owned was sold to Kohn Brothers. The evidence of respondents as to when the sale was made by the meeting of the minds of the appellant and Kohn Brothers, is shown by the testimony of Joe Kohn, offered by the respondents, and by the testimony of the appellant, offered on his behalf.

The testimony of Joe Kohn, with reference to this, is:

". . .; I bought the gin at Talipoosa about the 23rd day of July, 1938, bought it from W. M. Allgier; yes, sir, he is the gentleman sitting over there; I entered into a written contract with him for the purchase of that gin; the consideration was $17,500; I paid him that amount in cash; I learned this property up at Talipoosa was for sale when Mr. Smith and his son contacted us in the year of 1937 and he then told us to meet him at Malden and we did, and on that day we decided not to fool with his gin until 1938; . . . Q. Now in 1938, how did you learn the gin had been offered for sale again? A. Well, Mr. Palmer came in during one day. He used to be on my farm and he said there was a possibility of buying this gin up there, and I don't remember what time of the month it was but it was in July, and it was a gin that I might be interested in and that it was the same one that I talked about

in 1937 and that was when this gin was first called to my attention. No, sir, that was in 1938; that was when I had this conversation with Mr. Palmer; at this time I had known Mr. Palmer several years, he had farmed for me several years; when he left my farm he went some place near Bernie; . . . Q. What did he tell you, if anything, about the gin having been listed for sale with the Smiths? A. I don't remember anything about that, but he said if you are interested I think you can buy it. Q. And what did you tell him, if you remember? A. Well, we discussed about it there as we had more than one gin in consideration and I told Mr. Palmer that if it was the gin that I had in mind we would be interested. That was in 1938, and Mr. Palmer said it was the gin we wanted. I talked the matter over with my brother and then we contacted Mr. Allgier; no sir, I don't believe Mr. Allgier owned another gin at that time; I can't say exactly when I first contacted Mr. Allgier after Mr. Palmer talked to me, but it was before July 23rd. I made two or three trips to Mr. Baynes' office before the deal was closed; the trips were not very far apart; they were something like a week apart. Q. If the deal was closed on the 23rd of July you had made trips to New Madrid to Mr. Baynes' office at least a week before this deal was closed? A. Something like that. Q. And that was after the conversation you had with Mr. Palmer? A. Yes, sir. Q. Now, if it hadn't of been for Mr. Palmer telling you this gin was for sale in 1938, would you have known anything about it?

"Q. And nobody besides Mr. Palmer told you about the gin being for sale by Mr. Allgier until you saw Mr. Allgier. A. I don't remember whether Mr. Allgier contacted me about that time or not. Q. All right. Between the time Mr. Palmer saw you and you saw Mr. Allgier did anybody else see you. In other words, did Mr. Allgier come to see you or did you go to see him? A. I really don't remember. Q. All right, now, did you have any knowledge of this particular gin being offered for sale until in 1938 and until Mr. Palmer talked to you? A. No, sir, because in 1937 was the first time Mr. Smith contacted me."

On cross-examination he said:

". . . I stated that somebody by the name of Palmer came to my place in Hayti and told me that I might be able to buy a gin that I was interested in. Q. Now did Mr. Palmer tell you that he was representing anybody else? A. I can't say about that. Q. Now didn't he in an ordinary conversation merely suggest to you that you may be able to buy that gin you were interested in—isn't that the way it came up? A. I don't know, but he brought the matter up. I don't remember whether or not he told me he was representing the Smiths or anybody else. Yes, sir, I believe I did go and see Mr Allgier about the purchase of this gin. I believe Mr Allgier did stop to see me one day at my store in Hayti while he was in route to Blytheville or Memphis and suggest that he would like to sell me the gin. Q. And when that conversation

was had between you and Mr. Allgier I'll ask you if Dan Miller wasn't present and that you and Mr. Allgier discussed the gin business and you suggested to Dan Miller at that time to go look at the gin and see if you were interested? A. That may be true. I believe it is right. Q. And that is how come you to become interested in the purchase of the gin was for the reason Mr. Allgier came by that day and discussing the matter with you? A. Yes, sir, that and refreshing my memory of Mr. Palmer's statement. Q. After Mr. Palmer mentioned it to you you didn't start any negotiations until Mr. Allgier came by? A. It seems to me like I went and talked to Mr. Allgier after I did Mr. Palmer. Q. What you meant a minute ago when you said Mr. Allgier came by your store and you discussed the transaction you at that time said you would go and look the gin over? A. It seems like that, yes, sir, after the conversation with Mr. Palmer; I don't believe I had looked at the gin in 1938; after this conversation with Mr. Palmer, Dan Miller and I did go look over this gin; I then begin direct negotiations with Mr. Allgier for the purchase of the gin. Q. In fact, you went up the next day after Mr. Allgier was at Hayti and discussed this matter with you? A. I don't know about that, but it was soon after that. Q. Will ask you if it wasn't the 3rd day of August that you completed the purchase of this gin from Mr. Allgier? A. Well the original contract was drawn on July 23rd and we had a supplemental contract to that deal. I don't remember the date the deal was closed. Yes, sir, the 23rd day of July is when the contract of purchase was made. Q. But the transaction was not completed until the 3rd day of August—isn't that right? A. That August 3rd contract was a supplemental contract to the original. The contract made on the 23rd day of July was the first contract made. There was some difference between us then; Yes, I guess negotiations were called off. We drew another contract on August 3rd. The reason for forfeiting the contract on July 23rd was because of the difference between Mr. Allgier and myself. Outside of some verbal conversation, from the 23rd of July until the making of the contract on August 3rd there was no deal between Mr. Allgier and myself. On July 23rd we were in your office most of the day until late in the afternoon and I definitely told Mr. Allgier that I would not take the gin under the conditions upon which he was insisting. Outside of verbal conversations, nothing further was done in the way of completing the deal until August 3rd. Q. Now, Joe, did you ever tell Mr. Allgier that Mr. Smith, the plaintiff in this case, or Mr. Palmer are the ones that interested you in the purchase of this cotton gin in 1938?

"A. I told Mr. Allgier that the Smiths were the people that told me about it first; that was in 1937; I can't give you the exact date I told him that, but it was between 1937 and the time the deal was

made; I had give up all ideas of the purchase in 1937. Q. And you didn't know this was the gin you wanted or that it was available except a very short time before you made the deal? A. Not until Mr. Palmer told me about it. I did not know, at the time, that Mr. Palmer was employed by Smiths.''

On re-direct examination, he said:

''I made a small down payment in this matter; I don't remember whether it was $500 or $250; I put it up the day of the contract, I think about July 23rd; to the best of my knowledge; I deposited the money on July 23rd; I don't remember how long it was after Mr. Palmer saw me until Mr. Allgier came to see me.''

On re-cross examination, he said:

''At the time Mr. Palmer mentioned about this gin I don't believe he told me anything about the purchase price or what it would cost, or anything like that; I learned what the sale price would be after I contacted Mr. Allgier. In the year 1938 I believe that Mr. Smith did tell me that he thought the gin could be bought for $16,500.00; I don't remember what date it was but it was before July 23rd; I believe he told me that in both years. Q. Don't you know as a matter of fact, that Mr. Smith never did discuss this sale price of this gin with you after 1937 until you started negotiations direct with Mr. Allgier? A. I don't remember. Q. Now, I'll ask you if it isn't a fact that Smith or either of them never did come to see you about buying this gin in 1938? A. I believe they did. Q. Well, now if they told you that the gin could be bought for $16,500 you certainly could not have given $17,500 for it, could you Joe? A. Well, we were going to make the trade. Q. Yes, but if Smith priced it to you as $16,500 at that time didn't he offer to contract with you for the sale of it? A. I don't remember about that. Q. Well, he offered to sell it for $16,500 (interrupted) A. He said it could be bought for that and in making up our minds we decided to buy it and went ahead and did it. Q. Well, now after the conversation you had with Mr. Allgier when he came to your store to see you that really caused you to start negotiations and finally purchase the gin? A. That was after we got interested the last time. Q. Mr. Smith had not talked to you at that time? A. That was after Mr. Palmer talked to me; he merely told me he thought the gin could be bought; he didn't attempt to tell me the price; I didn't talk to Smith until after I talked to Allgier; that is right; I didn't talk to Smith until after I discussed the matter with Mr. Allgier and he and I agreed on the price; I don't know how long after that it was that I had this conversation with Smith; it was some time, though. I remember Dan Miller being present when Mr. Allgier and I discussed the purchase of this gin.''

On re-direct examination, he said:

. . . . . .

"A. Mr. Smith called on me at my office with reference to some land matters and he probably mentioned the gin. I remember him calling on me. I remember him coming to see me at my gin office in Hayti; I don't remember what month it was, but it was in the spring or summer of 1938; it was before I saw Mr. Palmer; I couldn't say if this was the first time that Smith or anybody had said anything to me about this gin."

On re-cross examination, he said:

". . . It probably would have come to my mind if Smith had discussed the sale of this gin with me at that time when Mr. Palmer again mentioned it."

On re-direct examination, he said:

". . . Q. Now, as to the conversation that Mr. Palmer had with you telling you about the gin—telling you the gin was for sale, that is what revived your interest in the matter? A. Yes, sir."

On re-cross examination, he said:

". . . After you discussed with Mr. Allgier was that when your interest was revived and when you went and examined the gin? A. That was when we started negotiations."

Witness Palmer testified that he represented the firm of Smith and Smith, and fixed the date when he saw Joe Kohn at his cotton gin office, as July 15, 1938, and said that, at that time, he was representing the respondents.

On direct-examination, he said:

". . . Q. Well, when you got to Joe Kohn's what did you do? A. Well, we talked, I don't remember exactly what we talked about for awhile and I finally told him about the Allgier gin being for sale, but he must have had some other gin on his mind because he said he would not be interested in that gin and that if it was the one Allgier had the year before that he would be interested in it and asked me if it was the gin at Talipoosa and I told him it was, then he told me he would go and see Bill himself. Then I went back to Malden; I saw Mr. Smith; I don't know what he did because I went on home; I don't know if I saw Mr. Allgier any more after that; I suppose I saw Mr. Smith before the time the sale was made; no, I didn't see Allgier or Joe Kohn."

On cross-examination, he said:

"I don't remember if I told Mr. Kohn that I represented Mr. C. M. Smith and Company; I don't remember if I had instructions from Mr. Smith not to tell him; no, sir, I am not telling this jury I ever told Joe Kohn that I was representing Mr. Smith; the 15th of July was the only time I ever talked to Mr. Kohn about the gin. I don't know whether or not Mr. Kohn knew that I represented Mr. Smith or that Mr. Smith had a contract to sell this gin. I didn't tell him I had a contract to sell it myself. I told him Mr. Smith had a contract to sell it. Q. I thought you said you didn't tell him Mr. Smith had

anything to do with it? A. I didn't understand it that way. I did tell him Mr. Smith had the gin for sale. No I didn't tell him, when he said he was going to see Bill himself, that Mr. Smith had the right to sell it and he would have to go to him. No, sir, it isn't a fact I went to see Joe Kohn on a friendly visit. I didn't make him any price on the gin. I don't believe I mentioned the terms of the contract Smith had with Mr. Allgier on the occasion of the visit of July 15, 1938. It was my business to try to sell the gin that day; I told him Mr. Smith had it for sale; I did not tell him we had a contract or what was in it; I don't know whether he ever went to see Mr. Allgier about this gin; I never had any other conversation with Mr. Kohn between July 15 and August 3rd, 1938 outside of this day I mentioned about the gin; I do not know of anything else that happened between these parties, Smith, Allgier, and Kohn, between those dates. I don't recall the date that I first learned that Mr. Kohn had bought the Allgier gin; it was after I saw Joe Kohn, Mr. Smith told me that Joe had bought the gin; I don't remember whether he knew it or just understood about it; I don't recall that Mr. Smith ever told me that I should see Joe Kohn and not let him know that I was connected with it in any way and that Joe did not like real estate dealers.''

On re-cross examination, he said:

''I hadn't seen Mr. Kohn before July 6th relative to selling this gin; I didn't go there until the 15th; . . .''

The most favorable view for respondents that can be taken of Joe Kohn's testimony is that Kohn, acting on the information he received from the witness Palmer, contacted Allgier on the 23rd day of July, 1938, and agreed to purchase the gin, and consummated the purchase on August 3, 1938. He refers to a contract of July 23, 1938. On that date he made a deposit of $500 or $250—he did not remember which. No such contract appears in the abstract. A warranty deed, dated the 3rd day of August, 1938, by which William Allgier (the appellant) and his wife conveyed the property, consisting of the gin and four acres upon which the gin is situated, to Kohn Brothers (naming them), for a recited consideration of $17,500, appears in the abstract. The abstract also shows another warranty deed, by which Allgier and wife conveyed to Ellis Kohn, for a recited consideration of $1 and other valuable consideration, sixteen acres of ground, situated in the County of New Madrid and State of Missouri, to-wit:

The E½ of the SE¼ of the SW¼ of Section 36, Township 22 N. Range 11 E., except and less a tract of land previously sold to Kohn Brothers, of four acres, containing sixteen acres, more or less.

This deed is dated the 3rd day of July, 1938, but it is conceded that the correct date was the 3rd day of August, 1938.

The testimony of the appellant, on his own behalf, with reference to the *time* that Joe Kohn, representing the firm of Kohn Brothers, agreed to purchase the gin, and he, Allgier, agreed to sell it, is:

"Q. Well, was the gin sold from June 25, 1938 to July 1, 1938 to anyone? A. No, sir; on July 21 I gave them twenty days to sell the gin to Mr. Pratt; that is the exhibit here marked Exhibit 'D': from July 1 to the expiration of that twenty days neither of us, or anyone else sold that gin; I saw C. M. Smith on the 21st day of July, the last date under that July 1st contract; I went up to Malden and told them their time was up and I was not going to fool with them any more; their contract expired on the 20th; I did not authorize them to continue to attempt to sell the gin; they tried to get me to extend it another ten days and I refused. After that I went to Blytheville, Arkansas to see Mr. Highill and on my way back about three o'clock in the evening I decided I would stop and see Mr. Kohn to see if I could interest him in selling the gin. And I talked to him and told him the proposition and the price also, he talked to Dan Miller and they decided to go look the gin over the next day; they came and looked at the gin and said lets go right now to Mr. Baynes office and make a contract; that was on the 23rd; Mr. Kohn and I went to Mr. Baynes office that day; at his office we drew up a contract, we each put up a deposit of $250; that contract was not carried out; on the 25th he didn't come back and close the deal; Mr. Kohn got it in his head that I might build a new gin and he didn't want to sign a contract unless I agreed not to put a gin up and he said I would have to insure him 1500 bales of cotton and I did; about August 3rd we went back into a contract again; the terms of the contract on August 3rd was that I had to guarantee them 1500 bales of cotton; that was done with the 16 acres of land up against the cotton gin. I told them I would deed them the 16 acres of land if they didn't gin 1500 bales of cotton a year; yes, sir, I gave them a contract deed, they didn't buy that piece of land; . . ."

On re-direct examination, he said:

"Q. What happened on the 23rd day of July to the contract dated July 23rd, entered into with Kohn brothers? A. They failed or refused to come back on the 25th to make the deeds and when they did Mr. Kohn wanted to know how many bales of cotton I would insure him and I told him 1500 I believe and he wanted to know what I would put up to guarantee that and I told him; they wanted me to put up a thousand dollars; I told them I would put up that piece of land. . . ."

"Q. Who refused to carry out this contract? A. Kohn Brothers. Q. Tell the jury what happened. A. Kohn Brothers just refused to carry it out.

"Q. State to the jury what the facts were that happened after this July 23rd contract.

"A. On June 25th, we made a contract for the gin at $17,500 and we each put up a $250 forfeit and we were each to come back on July 25th, and I was to make him a deed and he was to come back and make the deeds and when they did come back, Joe Kohn said, 'I'm afraid you are going to put up a new cotton gin at Risco.' And I said, 'No, I don't intend to do that.' We couldn't get together and we went home. I didn't draw my deposit and he didn't draw his and it went on to August 3rd, when we made a new contract and closed the deal. . . .''

This is the entire evidence, *pro* and *con*, as to the *time* when the minds of the parties to the sale met so as to constitute an agreement on the part of Kohn Brothers to purchase the gin from the appellant. From this it will be seen that the preliminary agreement between the parties was on July 23, 1938, and that, at that time, according to John Kohn and Allgier, each made a deposit. Kohn did not remember whether he deposited $500 or $250. Allgier says that each deposited $250 and they were to consummate the purchase, by deeds, on July 25th. Allgier says that Kohn did not come back at that time, and that neither withdrew his deposit; that when he did come back he wanted Allgier to guarantee 1500 bales of cotton per year and to secure the guaranty by putting up $1000; that they eventually agreed that, to secure the guaranty, he would deed the additional sixteen acres of ground; and that the deal was finally consummated, on August 3rd, by the deeds offered in evidence. According to Allgier's testimony the deed for the sixteen additional acres was a mortgage to secure the guaranty. The testimony leaves indefinite the question as to the number of years to which the guaranty related.

There is no testimony in the case showing, or tending to show, that there was an agreement between the parties, by which Allgier agreed to sell and Kohn Brothers agreed to purchase the gin, prior to July 23, 1938. According to the testimony of both the purchaser and the appellant, a tentative agreement was actually made on that date. This agreement was not consummated at that time. It was subsequently changed to include the guaranty with reference to the number of bales of cotton, and was consummated on August 3, 1938, by the execution of the two deeds.

Unless the respondents were entitled to recover on the written contract declared on and pled by them, even though the sale was made after July 21, 1938, because their agent brought the parties together by interesting Joe Kohn in the purchase on July 15, 1938, the respondents were not entitled to recover on the undisputed facts. This has been directed decided by the Supreme Court of this State in several well considered cases; Young v. Stecher Cooperage Works, 259 Mo. 215, 168 S. W. 611; Gibson v. Pleasant Valley Development Co., 320 Mo. 820, 8 S. W. (2d) 828; LaForce v. Washington University, 106 Mo. App. 517, 81 S. W. 209; Westerman v. Peer Investment Co.,

197 Mo. App. 278, 195 S. W. 78; and Bowman v. Rahmoeller, 331 Mo. 868, l. c. 878, 55 S. W. (2d) 453, l. c. 457, 458.

. . In the case last cited, after citing the cases *supra*, the court says: ". . . The rule laid down by these cases is well stated in the Young case. There plaintiff was given an exclusive agency to sell a tract of land within twenty days at $11 per acre. Plaintiff had evidence to show that before the expiration of the twenty days he obtained an offer of $10 per acre for about three-fourths of the land which was communicated to the owner with the name of the prospective purchaser. After the expiration of the plaintiffs' agency, the defendant sold this same portion of the land at $10 per acre to the purchaser plaintiff claimed to have procured. The court held that a demurrer to the evidence should have been sustained, saying:

" 'The contract between Young and the defendant, taken in connection with the fact that Young did not, within the contract time of twenty days, "secure a purchaser" willing to take the land at the price named, leaves the plaintiff without any cause of action. Under that contract, had Young within the twenty days introduced to defendant a person able, ready and willing to buy at the price, defendant would have been liable for the commissions whether he ever closed the deal or not. That was his contract. By that contract, the failure of Young to secure such purchaser in the allotted time left the defendant free to sell to any one for such price as suited it. The fact that Young within the contract time found a person or persons willing, able and ready to take a part of the land at a reduced price, even though that fact was communicated to the defendant, and even though the defendant, after the expiration of the contract time, closed with the purchaser on such reduced terms, does not avail the plaintiff.' "

Observe that, under the rule there laid down, the respondents, in order to be entitled to a commission, were required to produce, within the time limited in the contract, "a person able, ready and willing" to buy at the price fixed—which means that Kohn must have been not only able, but *ready* and *willing* to buy at the price named, *within the time so fixed*. The fact that his mind had reached the state where he was willing to consider buying the property, but had not reached the point where he was *ready* and *willing* to buy the property, and had, within the time limited in the contract, communicated such fact to the appellant, leaves the respondents without any cause of action on the written contract.

Under the authorities supra, the court clearly erred in refusing to direct a verdict for the appellant. There is no escape from this inevitable conclusion. The Bowman case is directly in point and is the last controlling judgment of the Supreme Court, which we are bound to follow.

In the instant case, the *time* within which the respondents were to produce a person ready, able and willing to buy the property, is definitely, clearly and unambiguously fixed by the written contract. The time so fixed is as much of the essence of the contract as are its other provisions. Hence, we are compelled to reverse the judgment. Whether we should do so without remanding it, or whether we should do so with directions to dismiss the respondents' case, presents a more difficult question.

It is unnecessary to decide (and, in fact, we are not called upon to do so) whether, if the appellant had signed a ten day extension agreement before July 21, 1938, this case, as presented, would have been a submissible one. This for the reason that both of the parties agreed that the respondents requested the extension and the appellant refused to grant it. It was not mere oversight or neglect on the part of the appellant, but was an intentional act on his part. He had a perfect right either to grant or to refuse the extension, and he refused it. Hence, it is clearly outside of this case as now made to undertake to determine what the rights of the parties would have been if the appellant had signed an extension extending the agreement for ten days from July 21, 1938.

The following additional facts with reference to an oral agreement outside of the written contract, appear in the abstract in this case.

C. M. Smith, Jr., testified that he, his father and Mr. Allgier went to Tennessee to sell the gin and that they came back by way of Hayti. He said:

". . .; between the time we left home and the time we got back there was something said with Bill Allgier about selling his gin; there was discussion had in which the Kohn Brothers were mentioned. Q. Tell the court and jury what was said? A. Coming across the ferry below here and coming up the road to the Caruthersville and Hayti road, my father suggested we should go to Kohn's and see if we could sell the gin and he said it was getting late and Mr. Palmer said if it was too late to let it go and he would come back next week and we went into Hayti and Bill suggested that he wanted to get home and we just went on. We were in Bill Allgier's car; about a week later Mr. Palmer went to Hayti; I was in the office when Mr. Palmer got back from Hayti; I heard what he reported about it; after he made his report my father immediately had me call Mr. Allgier at Risco and my father talked to him; father told Bill that Palmer had reported that he had Kohn interested in the gin but Kohn thought he had better go direct to Bill and he told him they would be there any day and the next morning Bill came to the office and said you'll never be able to sell that gin to Kohn Brothers as they are not interested and he said well if they buy it he would pay the commission."

With reference to this matter C. M. Smith testified, as follows:

". . . Mr. W. M. Allgier was in the car when I came back by Hayti on that trip; we did have a talk at that time about Kohn brothers. I discussed with him at that time the probability of selling this gin to the Kohn brothers, I told him we were going to sell it to them through Mr. Palmer. Q. All right, what else did you tell Mr. Allgier at that time about selling this gin to Kohn brothers? A. I told him going to Tennessee, I wanted to get back to Hayti in time to meet Mr. Kohn or to have Mr. Palmer meet Mr. Kohn, but it was so late I told Mr. Allgier we would put it off a few days. Q. What connection did Mr. Palmer have with your firm? A. His father-in-law, that was killed down here some place, was working for me and he took his place. He had been working for me about six months or a year before the time I sent him to see Joe Kohn. He went to Hayti; after he came back he reported to us what Joe Kohn said: . . . I called Mr. Allgier that night and told him Mr. Palmer had gone to see Joe Kohn and he thought it was favorable to sell the gin, but he did not want to buy it from a Real Estate Company, and I told him that he may go straight to Mr. Allgier as I thought he didn't know just what he wanted to do."

He further said:

". . . Q. At the time after you had this conversation with him about Joe Kohn and at the time you asked him to sign this letter of extension, what did he tell you about it? A. He said he didn't believe they would buy it and I said they will just as sure as we are sitting here and I asked him to sign that ten day extension."

On cross-examination, he further said:

". . . Q. You don't contend that Mr. Allgier didn't have a right to sell this gin himself do you? A. He was to sell it for us. If you can make an oral agreement it was his property but he understood that we were going to send Mr. Palmer there to see Mr. Kohn. . . . He would not sign the last extension but said he would pay just the same. We all understood that."

With reference to the Tennessee trip, witness Palmer said:

"Q. Do you recall what was told to Bill Allgier, if anything, on July 6th or there about when you came back from Tennessee and got over to Hayti or between Caruthersville and Hayti, but something was said about going by and seeing Mr. Kohn; I remember somebody suggested that we go by and see him and some of the bunch suggested that it was too late and better wait and let me see him in a few days."

W. M. Allgier, the appellant, testified:

". . . Q. Now, in 1938 between the dates of June 25th and July 21st, did C. M. Smith or J. A. Smith or any one for them tell you they had a purchaser in Kohn brothers for this gin? A. They never mentioned Kohn to me; no, sir, Smith did not call me over the telephone before July 15th and tell me Kohn brothers would buy the gin; we did go on a business trip in July and pass through Hayti; they

never mentioned Kohn brothers to me on the entire trip; we went to sell the gin to Mr. Pratt; we entered into a contract with Mr. Pratt; the contract expired on the 20th; the deal with Pratt did not go through; I did not see the Kohn brothers until July 22nd; Mr. Palmer never told me Kohn brothers would buy the gin.

". . . on the way back from Tennessee we didn't talk about going to see Kohn that night; no, sir, C. M. Smith did not call me over the telephone on the night of July 15th; . . . They never did mention Kohn brothers to me. I went to Blytheville and on my way back I decided to drive over and have a talk with Kohn Brothers about this gin. . . ."

This testimony, concerning which there is a direct conflict, might furnish a sufficient basis to enable the respondents—if they should desire to do so—to amend their petition and present their case based solely on an oral agreement, pleading the written contract, if at all, as a mere inducement and not as the grounds of recovery. Under such state of the record this court may remand the case. [Patzman v. Howey, 340 Mo. 11, l. c. 25, 100 S. W. (2d) 851.] Whether they can present a submissible case on an alleged oral agreement cannot be determined on the record as it now stands. There is a sharp conflict in the evidence with reference to such an oral agreement. This conflict would seem to leave little, if any, room for the conclusion that one side is honestly mistaken with reference to this matter, and it would appear that one side to the controversy must be testifying falsely with reference to such an oral agreement.

The issue as to whether there was such an oral agreement should be clearly defined by the pleadings, and, if the jury should find that there was, in fact, such an oral agreement and that a verdict for respondents would be justified, the right of the respondents to recover should be clearly limited thereto. In other words, the jury should be so instructed that it would clearly comprehend and understand that the disagreeable duty is imposed upon it to determine what is, in fact, the truth relating to whether there was or was not an oral agreement, and, if there was such an agreement, what its terms were and whether respondents had complied therewith.

The judgment of the trial court is reversed and remanded for further proceedings in accordance with this opinion. *Smith* and *Fulbright, JJ.*, concur.