HERB TILLMAN CO., Inc., a corporation, and Fred McMahon, Plaintiffs-Appellants,

v.

Hobert SISSEL, Defendant-Respondent.

No. 7888.

Springfield Court of Appeals. Missouri.

Aug. 31, 1961.

Leland C. Bussell, Bussell & Hough, Springfield, for plaintiffs-appellants.

Walker, Daniel, Clampett, Rittershouse & Ellis, Springfield, for defendant-respondent.

RUARK, Judge.

This is an appeal by plaintiffs from an adverse judgment based on a jury verdict in their suit for broker's commission alleged to have been earned in the sale of a house.

Plaintiffs' petition charged that on March 28, 1959, defendant Sissel, now respondent, entered into a written contract with plaintiff Herb Tillman Co., a corporation, whereby Tillman was granted the exclusive right to sell certain property, for a period of sixty days, "for a total consideration in the amount of a loan to be obtained on said property," and that defendant would pay to the plaintiffs therefor a commission of five per cent of the purchase price; that plaintiffs succeeded in interesting a Mr. and Mrs. Melvin Whittaker in purchasing the property and secured a written contract of purchase from the Whittakers; that said contract was submitted to the defendant, who accepted it and signed the contract; and that said contract has "subsequently been lost or destroyed" (of this more anon); that such contract called for a purchase price of $14,500 and was executed on or about the 2nd day of April, 1959; that without the knowledge of the plaintiffs, defendant entered into a new agreement to sell to the Whittakers in an attempt to avoid plaintiffs' commission, although plaintiffs had produced said Whittakers as purchasers ready, willing, and able to pay.

The answer is in substance a general denial.

The undisputed facts are that on *March 28, 1959,* plaintiff Herb Tillman Co., a corporation, was a broker and plaintiff Fred McMahon was its salesman. Defendant was a builder. On March 28 a group of builders in an area known as "Indian Meadows" met in Tillman's office. Cards containing a printed form of "Exclusive Right to Sell" were filled in by McMahon and passed around to the builders. Defendant says he signed five cards for different properties. The particular card involved and upon which plaintiffs base their right to recover granted to Tillman the exclusive right to sell a certain residence for a period of sixty days from date, "for a total con-

sideration of $——— payable $——— down and ——————————— and pay 5% commission of purchase price."

As to what was meant by the "Get loan" provision there was a sharp difference. Plaintiff McMahon testified that the purpose of such expression was "that would show that there would have to be a loan, that there would have to, have a loan got— there would have to be a loan got to sell the property, because if they didn't have cash they would have to have a loan." "No, sir. Now, a loan was going to have to be obtained, but no real estate firm guarantees to get a loan. We may agree, naturally, to try to help get a loan, but we certainly don't guarantee, no real estate firm does, we don't get the loan." "That 'Get loan' just means a loan would have to be obtained."

"Q. And getting the loan was a part of your contract, wasn't it? A. Not necessarily.

"Q. Well, by 'not necessarily,' you mean it could be, or it could not be? A. Many times we would offer to assist, but we didn't guarantee to get the loan, no, sir.

"Q. Did you enter any discussion with the Whittakers [the buyers], telling them that you would get them a loan? A. That, I don't remember.

"Q. How about Mr. Sissel, did you tell him that you would get a loan? A. I don't remember that either. I don't think that I discussed a loan, getting a loan, with Mr. Sissel, at all."

On the other hand, defendant testified that the reason "Get loan" was written on the listing was, "He [McMahon] come up with an idea of getting some 90 per cent loans, and that was the theory that we all—all of us builders signed on, our exclusive contracts in Indian Meadows," that it was the understanding that 90% loans would be obtained. He testified that it was the understanding between him and McMahon that Tillman Co. would get the loan.

Later plaintiff McMahon produced a Mr. and Mrs. Whittaker as possible purchasers and they made a written offer of purchase for the tract, which he said Sissel accepted and signed. Along with this offer of purchase, McMahon received from the Whittakers a check for $500 to apply on the purchase price. At the trial McMahon testified that he did not have any of the original copies of this offer of purchase.

"Q. * * * do you know where any of the original copies are * * *? A. I do not, no, sir.

"Q. Do you have any in your possession? A. No, sir.

"Q. Have you looked and tried to find them? A. Yes, sir, I have."

He then produced, identified, offered, and had admitted into evidence Plaintiffs' Exhibit 2, which he said was correct and that he had prepared it from his recollection. This was (he said) a copy of the original paper which the Whittakers signed. Such exhibit is a filled-in form of offer to purchase, dated May 20, 1959, fixing a date for consummation of sale on or before August 1, 1959, showing the typewritten signatures of "Melvin B. Whittaker" and "Charlene Whittaker," and then, "Above offer accepted 8 5–20, 1959," with the typewritten signature of "Hobart Sissel."

Later McMahon testified that *he had returned both the contract and the $500 check to the Whittakers*. His explanation as to the return of the check was, "Well, the Whittakers being a next door neighbor, and I felt the $500.00 was, for a couple of youngsters like the Whittakers, was quite a sum of money, and thought perhaps they needed their money * * *." He offered no explanation as to why the contract was returned. He said, however, that in so doing he did not intend to abandon the contract.

"Q. You were still intending to help her get a loan? A. Yes, sir."

He testified that this contract provided for securing a loan in the amount of $12,500.

"Q. Any particular time limit? A. We had to get the deal closed on or before August the first."

Later, under cross-examination, he testified:

"Q. And it is your contention that you had until August 1st, August 1st of 1959, in which to get this loan? A. Yes, sir."

Later, however, he said:

"Q. Could it have been July 1st? A. No. July 15th, or it could have been August 1st, or August 15th."

Defendant then produced (Defendant's Exhibit A) a signed copy of the actual offer to purchase, which McMahon identified as such.

The offer to purchase was dated *May 11, 1959*. In it Melvin B. and Charlene L. Whittaker offered to purchase the property for the sum of $14,000, of which $500 was deposited with Herb Tillman Co. The balance was to be paid "$1500 more in cash at close of deal, and secure a loan of $12,000 for 18 years, 20 if possible." It was provided that "unless delay is necessary to correct title defects, or to complete above loan * * * this transaction closed on or before *July 1st, 1959*," and

possession was to be given on the same date. The contract further provided that "if this offer is accepted within ten (10) days from this date, the above deposit shall apply on the purchase price," and also contained a provision for liquidated damages of 10% of the sale price in event either party failed to consummate. This offer to purchase was submitted to Sissel and on the same date he made a counter offer by writing on the offer of purchase, "Cannot accept above offer but will accept $14,500." The parties agree that the Whittakers accepted the counter offer as a contract, and the instrument shows the figure $12,000 (loan) in the instrument was written over to show $12,500, and on the margin was written, "Changes noted, M.D.W. C.L.C."

After the contract came into being, the Tillman Co. set out to secure a loan, but by the latter part of May it had not been successful, although McMahon testified that he still had one possible prospect who had promised to go look at the house.

Mrs. Whittaker, also testifying for the plaintiffs, said she signed the (one and only) agreement of purchase sometime between the 11th and 13th of May and gave McMahon a check for $500 as earnest money at that time; that it was her understanding the deal was to be closed by July 1 because that was when the lease was up on the house where they lived; that in dealing with Mr. McMahon the Whittakers told him "what we could pay down, and what—the amount of loan that we would have to have, you know, before we could buy the house. And he went to several different loan companies and hadn't been able, so far, although he was still—they was still one loan company—one loan company was still supposed to go out and appraise the house."

"Q. Well, in the course of your conversations did you understand each other, that you couldn't take the house if you didn't get the loan? A. We did. Well, yes, sir."

McMahon returned the contract and down payment to her "probably the last of May, sometime." He said he hadn't been able to obtain a loan up to that time; that he had another fellow from a loan company who had promised to go out and appraise the house. He did not return subsequently with anyone to make the loan and she never saw him again until the deal was closed with Sissel.

Sometime after that (defendant testified "it was around—oh, July 1st, best I can remember"), *Mr. Whittaker called Sissel.* Negotiations were opened. Sissel helped them get a loan and the Whittakers purchased the house and took a deed on July 17.

There is another fact upon which plaintiff McMahon and defendant failed to agree. Sissel testified:

"Q. Now, did you ever have any conversation with Mr. McMahon after July the 1st with regard to the status of this contract as to what he had done with it? * * * A. He come back and told me that he had had to tear the contract up, and give the Whittakers back their money. * * * He told me that he had to wash his hands of the whole thing, that he couldn't get the Whittakers their loan."

McMahon, on the other hand, denies making such statement. As we understand his testimony, there was no communication between him and Sissel from the time of the acceptance of the counter offer on May 11 or shortly thereafter until long after the sale was made in July. Certainly there is no evidence that he ever called upon or requested Sissel to help get a loan ("I don't think that I discussed a loan, getting a loan, with Mr. Sissel, at all"), and there is no evidence that he consulted with Sissel about returning the contract and earnest money before he did so.

Although defendant received a jury verdict, it was below and is here his contention that plaintiffs did not make a

submissible case, that his motions for directed verdict should have been sustained, and that we need go no further than the determination of such question. In considering whether plaintiffs made a submissible case we are required to consider all of the evidence in its light most favorable to the plaintiffs. But in so doing we must consider that the plaintiffs are bound by their own uncontradicted testimony and the uncontradicted testimony of their own witnesses.[1]

It is the plaintiffs-appellants' theory that (a) they had discharged all of their part of the contract and became entitled to a commission once the contract between the buyers and seller had been accepted, and (b) they had not abandoned the contract.

As to the production of the buyers, the plaintiffs rely upon those cases which hold that where a prospective buyer is procured by the broker, and the seller contracts with the buyer, then the seller, having accepted the buyer, cannot thereafter question the fact that such buyer was "ready, willing, and able."[2] This of course depends upon the contract between the parties and the circumstances of the transaction.[3]

In this case the exclusive listing contract between the seller and broker quite evidently contemplated that it was necessary for a loan to the purchasers to be secured. Plaintiffs' evidence clearly shows that plaintiffs understood this, and that, when McMahon took the offer of purchase to the defendant, they knew Whittakers *couldn't* buy unless they obtained a loan. This offer, which became the contract between the parties, took the necessity of a loan into considera-

tion. The purchasers became "able" only if this contingency was met. As to who, if anyone, had the burden of seeing that the Whittakers got a loan, if the practical construction of the parties means anything, then this burden was upon the plaintiffs, since they set out in an endeavor to secure the loan and, so far as the evidence shows, never once called upon the defendant to do so. And they thereafter, without consulting defendant, returned the contract and earnest money to the buyers, obviously because they had failed to procure the loan.

Thus, sometime before the date fixed by the buyers-seller's contract for consummation, and about the time or after the sixty-day listing contract between plaintiffs and defendant had expired, the plaintiff McMahon returned the contract and purchase money to the prospective purchasers, and so far as the record shows made no further effort to forward the transaction. Nothing further was done by him. Thereafter the *purchasers* re-instigated negotiations with the seller, and by the efforts of such seller a loan was obtained, something the plaintiffs had tried and admittedly failed to do; and because of this the transaction was consummated.

■ It is the rule of law that, if there has been a definite break in the continuity of events, a complete interruption in negotiations which amounts to an abandonment of the deal, and new forces thereafter bring about another negotiation and cause a consummation of the transaction, then the initial efforts of the broker cannot be considered as the proximate procuring cause of the sale which is ultimately made.[4]

1. Taylor v. Vestal, Mo., 304 S.W.2d 820; Picarella v. Great Atlantic & Pacific Tea Company, Mo.App., 316 S.W.2d 642, 649 (8, 10, 11); Adkins v. Boss, Mo., 290 S.W.2d 139(2).

2. 12 C.J.S. Brokers § 85a, p. 187; Axsom v. Thompson, 239 Mo.App. 732, 197 S.W. 2d 326(7); Isaac T. Cook Co. v. Craddock-Terry Co., Mo.App., 109 S.W.2d 731; Weisels-Gerhart Real Estate Co. v. Epstein, 157 Mo.App. 101, 137 S.W.

326; Dodge v. Childers, 167 Mo.App. 448, 151 S.W. 749.

3. Spitcaufsky v. Guignon, Mo., 321 S.W. 2d 481(1); Clarkson v. Standard Brass Mfg. Co., 237 Mo.App. 1018, 170 S.W. 2d 407; Nichols v. Pendley, Mo.App., 331 S.W.2d 673; see Williams v. Sodini, Mo.App., 267 S.W. 81.

4. 8 Am.Jur., Brokers, § 144, p. 1069; Real Estate Enterprises, Inc., v. Collins, Mo.

Plaintiffs argue, however, that McMahon's action did not amount to an abandonment on their part because abandonment involves intent, and the plaintiff McMahon plainly testified that he did not *intend* to give up on the transaction.

Conceding that "abandonment" usually involves intention,[5] such intention can be found or inferred from the conduct of the parties and the circumstances proved.[6] A man is usually judged by his conduct, not by his words. One is not free to vitiate the consequences of his acts simply by following them with the utterance of some magic incantation such as the words "I didn't so intend."

The wise Plato seith, as ye may rede,
The word moot nede accorde with the dede.
If men shal telle proprely a thyng,
The word moot cosyn be to the werkyng.[7]

But, regardless of whether the agent "abandoned" the transaction, we think there is a cogent reason why plaintiffs were not entitled to recover a commission in this transaction.

Unless it is otherwise understood and provided, the broker is the agent of the seller who lists property with him. To this seller he owes his undivided loyalty and the exercise of the utmost fidelity and good faith.[8] He is under ties as exacting as those imposed on a trustee in favor of his beneficiary.[9] It is his duty to keep his principal fully informed, to make full disclosure of all facts which materially affect the subject of his agency,[10] and to exercise reasonable care and diligence in the performance of his duty.[11] And of course he is obliged *not* to do any act which makes the transaction more difficult or burdensome for his employer or which endangers the transaction. In this instance there were buyers who were at least ready and willing, if not able, to complete the transaction. These buyers were not seeking to withdraw. In fact, it is obvious that they were anxious to go ahead, and the time for consummation of their contract had not expired. Under these circumstances the agent owed to his employer *at least* the duty to communicate with his principal and inform him of the situation before returning the earnest money and the contract to the buyers.

Whether the purchasers, the agent, or the seller had the duty of procuring a loan was at least an arguable question (if it was the agent's duty he failed to discharge it), and the seller had the right to insist upon, and litigate if necessary, if the contract failed, as to who was responsible, and as to whether the earnest money should be retained. But *assuming* (without, however,

App., 256 S.W.2d 286, 289; Taylor v. Vestal, Mo., 304 S.W.2d 820, 823; Rogers v. McCune, Mo.App., 283 S.W.2d 872; see Smith v. Allgier, 234 Mo.App. 392, 135 S.W.2d 43, 50; and Meredith v. Martin, Mo.App., 9 S.W.2d 860.

5. 1 Am.Jur., Abandonment, § 8, p. 6; Gerber v. Appel, Mo.App., 164 S.W.2d 225, 228.

6. 12 C.J.S. Brokers § 65, p. 149; 1 Am. Jur., Abandonment, § 13, p. 9; Hennick v. Kansas City Southern Ry. Co., 364 Mo. 883, 269 S.W.2d 646, 650; Gibson v. Sharp, Mo.App., 277 S.W.2d 672, 679; Goss v. Hill, 219 Md. 304, 149 A.2d 10, 69 A.L.R.2d 1239.

7. Geoffrey Chaucer, The Canterbury Tales, "The Manciple's Tale," 11. 207–210.

8. 17 A.L.R.2d 904, annotation; Martin v. Hieken, Mo.App., 340 S.W.2d 161(4), 165; Luikart v. Miller, Mo., 48 S.W.2d 867(6), 869; King v. Pruitt, 365 Mo. 823, 288 S.W.2d 923.

9. Dittmeier v. Missouri Real Estate Commission, Mo.App., 237 S.W.2d 201, 206; Restatement of the Law of Agency 2d, vol. 2, § 13(a), p. 58, § 387, p. 201.

10. 12 C.J.S. Brokers § 69b, p. 160; Politte v. Wall, Mo.App., 256 S.W.2d 283; Martin v. Hieken, Mo.App., 340 S.W.2d 161, 165; Acy v. Inland Security Co., Mo.App., 287 S.W.2d 347(5), 351(6).

11. Thomas J. Johnson & Co. v. Mueller, 356 Mo. 1109, 205 S.W.2d 521, 527.

so holding) that it was seller's responsibility to get the loan, he was still entitled to use the remaining period of more than one month (the latter part of May to July 1) in meeting that responsibility. Despite this, and without consulting the seller beforehand, the agent arrogated to himself the right to return the earnest money (and contract) to the buyers, a course of action which certainly *could have* made it more burdensome and difficult for the seller to consummate the transaction or to enforce whatever rights he had if it was not so consummated. The plaintiffs had no right either to rescind or to abandon on behalf of the seller. Regardless of whether McMahon returned the earnest money out of a kind heart and a friendly feeling toward the Whittakers (or whether he lost interest because he felt that his sixty-day listing period had expired and he had failed to produce an "able" purchaser), he was, in the eyes of the law, an unfaithful agent.

■ It is the rule that an agent who returns the earnest money when such return may hinder or prejudice any interest of his principal in respect to the transaction loses his right to commission.[12] Various reasons have been given.

In Politte v. Wall, Mo.App., 256 S.W.2d 283, which we consider to be the leading case on this subject, the court in rather strong language condemned the conduct of the agent in returning the earnest money.

It held the broker had *forfeited* his commission for breach of duty.

In Goss v. Hill, 219 Md. 304, 149 A.2d 10, 69 A.L.R.2d 1239, it was held that by such conduct the broker *waived* his right to insist upon a commission.

In Rhodes & Symes v. Nadeski, 9 La.App. 346, 119 So. 292, the return of earnest money was treated as a breach of duty in permitting a violation of the contract between the buyer and seller.

In Welton v. Smith, 77 Cal.App. 201, 246 P. 163, such conduct on the part of the broker was considered to be in violation of the contract between principal and agent.

■ We are not disposed to indulge in any polemics as to which theory or reason is applicable. We are satisfied with any or all. The plain facts, as appear by the uncontradicted testimony of McMahon and the plaintiffs' witness Mrs. Whittaker, are that the broker violated a duty which he owed to his principal, and because of such he has lost any right which he (may have) had to the commission. It is our opinion that the defendant's motion for directed verdict should have been sustained, and since the verdict and judgment was for the right party, such judgment is affirmed.

STONE, P. J., not sitting.

McDOWELL, J., concurs.

12. 69 A.L.R.2d 1244, annotation.