Charles ROGERS, Plaintiff-Appellant,

v.

J. D. McCUNE, Defendant-Respondent.

No. 29259.

St. Louis Court of Appeals. Missouri.

Nov. 15, 1955.

F. D. Wilkins, Louisiana, D. E. Williams, Troy, for appellant.

Omer H. Avery, Troy, for respondent.

ANDERSON, Presiding Judge.

This is an action in quantum meruit for the recovery of a broker's commission upon the sale of real estate. There was a verdict and judgment below for the defendant. Plaintiff has appealed.

Plaintiff, Charles Rogers, was a duly licensed real estate agent with an office in St. Louis County. Defendant, J. D. McCune, together with his sisters, Zenna McCune Morris and Alge McCune Wetherell, were the owners of a farm in Pike County consisting of six hundred and eight acres.

In June or July of 1951 Mr. Lowell Pasley, a banker in Bowling Green, Missouri, called plaintiff on the telephone and told him that he knew of a farm for sale. Shortly thereafter plaintiff went to Bowling Green where he met Mr. Pasley at the latter's bank. The two of them then drove to the McCune home which was located two and a half or three miles north of Curryville in Pike County. After being introduced to Mr. McCune, plaintiff and Mr. Pasley inspected the farm, after which plaintiff was invited into defendant's house to discuss terms of sale. Mr. Pasley was present at the time. Plaintiff requested an exclusive listing of the property, but defendant refused this request.

Plaintiff testified that defendant told him he would not give an exclusive listing because he was afraid it might cause hard feelings on the part of a very close friend who was in the real estate business. Defendant denied making such statement and testified that he told plaintiff the reason was because he owned only a one-third interest and did not have the right to give plaintiff an exclusive listing. Plaintiff testified that defendant then stated: "If you can sell the farm, if you bring a buyer, my word is my bond. If you send a buyer and they tell me that you sent them, I will protect you on your commission." Defendant testified that there was nothing said during that conversation about protecting Mr. Rogers on a prospect.

The parties then discussed the terms of sale. Defendant stated he wanted $80 an acre net to him. Plaintiff testified that he then stated: "Naturally, we would have to quote a price whereby you could afford to pay the commission—we have our advertising and I will have to be compensated for my services in obtaining a buyer;

and I said, 'Suppose we set a price,' and so he agreed to $100 an acre, expecting to have to take some off, of course, but he did insist on $80 an acre net as the least he would take and he couldn't pay a commission on $80 an acre." On cross-examination, plaintiff testified:

"Q. But the upshot of it was that whatever it sold for over and above $80 an acre, you were to receive as your commission? A. That's right.

*     *     *     *     *     *

"Q. And there was nothing further said about a commission other than about this $80 per acre net? A. Other than what I just said that prior thereto there was a discussion of a commission but he said he would rather deal on a net proposition of $80 an acre.

"Q. And there was nothing said about selling the farm for any less than $80 an acre, was there? A. No, sir."

Defendant testified that the agreement was that plaintiff should receive as a commission whatever was realized above $80 per acre. He stated that nothing was said about the price at which plaintiff might advertise the farm. According to defendant's evidence, the first time he knew that plaintiff was offering the farm at $100 per acre was later when Mr. Pasley informed him of it, at which time he told Mr. Pasley, "That's O.K. with me if he can get it." He stated that it was agreeable to him for plaintiff to set a price above $80 per acre.

Mr. Lowell Pasley testified for the plaintiff. He stated that he was present when plaintiff and defendant discussed the listing of defendant's farm. He testified: "Well, Mr. Rogers asked Mr. McCune wouldn't he list the farm and Mr. McCune said no, * * * he wouldn't list it with anyone but he wanted a net figure of $80 per acre and all over that Mr. Rogers could have for selling the farm, but he wanted a net figure of $80 per acre. * * * He said he wouldn't list it with

any agent. * * * Well, the only thing I can recall Mr. Rogers said was, 'I believe I can sell your farm.'"

Plaintiff and defendant had no further conversation concerning the sale of the farm. On one occasion, however, plaintiff met defendant on the road and had a brief conversation with him. The matter of the sale of the farm was not discussed. Plaintiff testified that the conversation at that time was of a "social nature." At the time, plaintiff had with him a prospect, Mr. James Duke, whom he introduced to defendant. Defendant at that time knew that plaintiff was trying to sell the farm, but had no knowledge of his advertising the farm in the newspaper.

On Sunday, September 9, 1951, plaintiff caused to be inserted in one of the St. Louis papers an advertisement describing the farm as being for sale and giving a general description of it. The price at which the farm was offered was not stated, nor was the location disclosed, except the statement that it was in Pike County. The acreage was given as 598 acres, instead of 608—its actual size. On Monday, September 10, 1951, plaintiff received a telephone call from Mr. Henry Landers who inquired about the farm. Plaintiff described the farm to Landers and told him that it was located on a gravel road three and one-half miles north of Curryville, and that the price was $100 per acre. Landers stated that he would like to inspect the farm that afternoon. Plaintiff, in reply, stated that he was busy that afternoon and could not go with him, but that if he would wait until the next day he would take him to .see the farm. Landers preferred to see the farm that afternoon. Plaintiff explained to Landers how to get to Curryville and then told him that the McCunes were well known in Curryville and that anyone there could direct him to the farm. He also requested that Landers tell the McCunes that he had sent him.

Landers went to Pike County that afternoon and inspected the farm. The following Thursday, September 13th, plaintiff saw Landers at the latter's home. Plaintiff testified: "I asked him if he had seen the farm and he said 'yes', and I said, 'What do you think of it?' and he said, 'I didn't like it,' and I said, 'What was wrong? I thought it was a very nice farm,' and he said, 'It sets too far back from the highway and there is no out buildings,' * * * and that he preferred to buy a farm near the highway. * * * he said he wouldn't consider it at any price. * * * After he said he didn't like the farm and wanted to know if I had anything else close to the highway—which I submitted one to him—anyway, we left—I had Mrs. Rogers with me and got maybe a half to three-quarters of a mile * * * I decided to go back and talk to him if it was the price he didn't like, and I turned around after I had gone maybe a half to three-quarters of a mile and I told him if it was a question of price I would be glad to submit an offer and he said that he wouldn't be interested at any price, that they didn't like it because it was too far off the highway and didn't have any out buildings.

"Q. But you never told Mr. Landers that it could be bought for any price lower than $100 an acre? A. I told him I would submit an offer."

Plaintiff made no further effort to sell the farm to Landers. He stated, however, that he took other prospective purchasers to see the land, and that McCune knew they had been there. Plaintiff also stated that he advertised the land probably ten or twelve times.

Plaintiff did not notify defendant that he was sending Landers to see the farm; nor did defendant see Landers at the time. However, defendant's wife did tell him that there was a man from St. Louis County who came to their door and asked about the farm. She did not say how many men there were with him, or their names; nor did defendant's wife tell him that these men stated that Mr. Rogers had sent them. She gave them a map which showed the way to the farm, which map they later returned.

Plaintiff was the only real estate agent from St. Louis County with whom defend-

ant had had any conversation about the farm.

In September, 1951, Mr. Landers, accompanied by his father-in-law, Mr. Albert Moss, and brother-in-law, Mr. Wilson Moss, called at the office of O. K. Williams. Mr. Williams was a real estate agent with an office in Bowling Green. The purpose of the visit was in connection with the purchase of a farm which Williams had advertised for sale. Williams had never before seen Mr. Landers, and had had no contact with these parties prior to their visit on this occasion. This farm, consisting of 575 acres, was located five miles due west of Eolia, near the boundary line of Lincoln County. The parties left Mr. Williams' office about four o'clock that afternoon and drove to this farm. No mention was made of the McCune farm at that time. Mr. Landers rode with Mr. Williams. Williams stated that Mr. Rogers' name was not mentioned that afternoon, nor was any explanation offered by Landers as to how they happened to be in Pike County, except for the statement that they were on the road back to St. Louis County. They did not say they had been in Pike County on any prior occasion. After inspecting the farm, which took about an hour and a half to two hours, Mr. Landers made the remark that the farm was too rough, and that they had better be getting home. Williams then remarked that it was unfortunate that they had not come sooner because he had other farms listed that he would be very happy to show them. They then told Williams that they would be back.

About a week or ten days later Albert Moss and Wilson Moss again called at Williams' office. At that time Williams went over his listings with them, describing them by giving the sizes of the various farms and the lay of the land, whether rough or level. The Mosses indicated at the time that they wanted level land, and asked Williams if he had any land of that character. Williams told them that he did and took them to see the McCune farm.

Williams showed them the entire farm. Defendant was not present at the time. Neither Mr. Landers nor Mr. Moss said anything about having previously viewed the farm. However, on a subsequent visit they did inform Williams that they had seen part of the farm, but said nothing about plaintiff having sent them up there for that purpose. They told Williams that after seeing an advertisement in the St. Louis papers about a 500 acre farm in Pike County they went to defendant's house; that Mr. McCune was not home, but that his wife told them how to get to the farm. Williams further testified that he himself had advertised the farm in the St. Louis papers, but not as a 500 acre farm. His advertisement described the true acreage—608 acres. On Moss' second visit to Williams' office he told Williams that he had not talked to plaintiff about the farm, but that his son-in-law had. Williams stated that Moss told him the price plaintiff had placed on the land.

About two weeks later Mr. Albert Moss again called at Mr. Williams' office. He was accompanied by Mrs. Moss. Landers was not with him on this occasion. Williams told the Mosses that he was quite sure the land could be purchased for $80 per acre and dealt with as 600 acres instead of 608 acres. In other words, Williams said he thought that defendant would throw in the eight acres. Up to that time Williams had not informed defendant of his dealings with Mr. and Mrs. Moss. A sale was not effected that day, but there was another inspection of the farm and a discussion with the tenant with reference to arrangements for possession of a part of the land. There was also discussed the matter of borrowing money on the land.

Mr. Moss then met with defendant and Williams in the latter's office. This was the first time defendant had ever seen Mr. and Mrs. Moss. Mr. Williams explained to defendant how far he had gone with the deal. After discussing the matter, defendant stated that he wanted to know definitely from his sisters if the arrangement was

agreeable to them. He thereupon made a telephone call to his sisters in White Sulphur Springs, Montana, to secure their authority to make a sale of the premises. About two weeks or ten days later a contract was entered into between defendant and the Mosses for the sale of the farm. Mr. Landers took no part in the previous conversations concerning the purchase of this property. Defendant met Landers for the first time the day the contract was signed. Williams testified that at the time the contract was entered into he knew that Mr. Landers, acting for Mr. Moss, had theretofore contacted plaintiff about the farm and that plaintiff had given Landers a price on it. Defendant claimed that he had no knowledge prior to the signing of the contract that Landers or the Mosses had been sent by Rogers to view this land.

This contract was dated September 22, 1951, and by the terms thereof the owners of the property agreed to sell same to Albert Moss and Mary Moss for $48,000. Later the land was conveyed to Albert Moss and Mary Moss, husband and wife. The deed was dated September 22, 1951, but was acknowledged by the McCunes on November 23, 1951, and by the sisters of Mr. McCune and their husbands on November 22, 1951.

Plaintiff first learned of the sale to Mr. and Mrs. Moss the early part of October, through a telephone call from Mr. Pasley. After receiving this information he called upon Landers who lived near Chesterfield in St. Louis County. Mr. and Mrs. Moss were not there at the time. Plaintiff testified that on that occasion he said to Landers, "I understand you bought the farm," and that Landers replied, "I didn't. My father-in-law bought it." Plaintiff, over the objection of defendant, further testified: "and I said, 'I understood when you called me that you told me your father-in-law had a farm and he had a pending deal on it and he was going to furnish the money and you were going to buy it together. * * * I just wondered why you didn't come to me.

I understood it was for you and your father-in-law in the original conversation. * * * I wondered why you didn't come to me if you changed your mind.' And he said, 'On another trip back to Pike County we inquired and asked about a real estate office and were directed to this Williams or Wilson Real Estate Company. * * * O. K. Williams.' "

Plaintiff then went to visit the McCunes. He did not see Mr. McCune, but did talk to Mrs. McCune. He told Mrs. McCune that he expected compensation for obtaining a prospect for the sale of the farm and requested that she have Mr. McCune write and let him know what he was going to do about it. Thereafter, in response to one of plaintiff's letters making demand for compensation, defendant wrote advising plaintiff to contact his (defendant's) lawyer, Mr. Clemens of Bowling Green. There was evidence that a reasonable commission for the sale of farm land in Pike County was five per cent of the purchase price.

After the execution of the deed Mr. and Mrs. Alfred Moss moved onto the land. Mr. and Mrs. Wilson Moss moved there later. The land was farmed by Alfred Moss and Wilson Moss. Landers farmed part of it, but lived on another farm.

Appellant assigns as error the refusal of the trial court to direct a verdict in his favor, as requested by him at the close of the whole case. Appellant relies upon the general rule that an agent earns his commission when he brings the parties together and shows that he was the procuring cause of the sale, even though the sale was actually completed by the principal.

■■ Such is the well recognized rule of law where the agent's authority is not limited or conditioned; but where a special contract exists, as where the agent agrees to sell for a net price to his principal, the agent cannot, in the absence of bad faith on the part of the seller, or a waiver of the right to insist upon the strict terms of the agreement, recover any commission

unless he sells for an amount in excess of the price authorized. Westerman v. Peer Inv. Co., 197 Mo.App. 278, 195 S.W. 78; Burdett v. Parish, 185 Mo.App. 605, 172 S.W. 620; Rosenblatt v. Multin, Mo.App., 222 S.W.2d 587; Gamble v. Grether, 108 Mo.App. 340, 83 S.W. 306; Dillard v. Field, 168 Mo.App. 206, 153 S.W. 532.

■ However, the seller must act in good faith, and must not, while the agent's authority stands unrevoked and while he is laboring in good faith to make a sale that will yield him a commission, fraudulently or improperly interfere by selling to a buyer produced by the agent at a price which would not yield a commission under the terms of the agency contract. A breach of good faith in this manner would entitle the agent to recover the reasonable value of his services. Burdett v. Parish, 185 Mo.App. 605, 172 S.W. 620; Cies v. Gale, 168 Mo.App. 282, 153 S.W. 1088. But the owner may in good faith insist upon the stipulated price, and if the agent fails to perform after being accorded full opportunity to do so, the owner may, as a separate undertaking, negotiate with the agent's prospect and sell to him without incurring liability for commission. Westerman v. Peer Inv. Co., supra; Gamble v. Grether, supra.

The evidence in this case shows that the parties entered into a special contract. The agreement was that in the event of a sale by plaintiff he should receive as a commission whatever amount was realized above $80 per acre. The proof shows a sale of the property by defendant to Mr. and Mrs. Moss for the sum of $48,000, which amounted to less than $80 per acre. Therefore, in order for plaintiff to recover the reasonable value of his services in this action it was incumbent upon him to establish—first, that he produced the Mosses as buyers of the property, and, second, that defendant either waived the terms of the contract with reference to the sale price and commission, or fraudulently and wrongfully interfered by selling the property for a sum less than the fixed price in order to deprive plaintiff of an opportunity to make a sale at a price remunerative to him.

It is appellant's position that the evidence shows as a matter of law that plaintiff's efforts were the procuring cause of the sale of the property to Mr. and Mrs. Moss. Respondent contends that the issue of procuring cause was properly submitted to the jury and that its verdict in his favor should be affirmed.

■■ For an agent to recover a commission upon the sale of property of his principal it is not sufficient that his act is one of a chain of causes producing the contract—it must be the procuring and inducing cause. The terms "procuring cause" and "inducing cause" refer to the cause which originates a series of events which without break of continuity result in the accomplishment of the object of the employment of the agent. Williams v. Mashburn, Mo.App., 37 S.W.2d 478; Gamble v. Grether, 108 Mo.App. 340, 83 S.W. 306; Crain v. Miles, 154 Mo.App. 338, 134 S.W. 52; Kyle v. Kansas City Life Ins. Co., 356 Mo. 331, 201 S.W.2d 912; Ramsey v. West, 31 Mo.App. 676; F. H. & C. B. Gerhardt Real Estate Co. v. Marjorie Real Estate Co., 144 Mo.App. 620, 129 S.W. 419; Nooning v. Miller, 178 Mo.App. 297, 165 S.W. 1119; Real Estate Enterprises, Inc., v. Collins, Mo.App., 256 S.W.2d 286; Young v. Stecher Cooperage Works, 259 Mo. 215, 168 S.W. 611; Westerman v. Peer Inv. Co., 197 Mo.App. 278, 195 S.W. 78; Good v. Robinson, 194 Mo.App. 453, 184 S.W. 955.

■ It is unquestioned that plaintiff was authorized by defendant to attempt a sale of this property. Pursuant to that authority plaintiff inserted an advertisement in one of the St. Louis newspapers, which advertisement attracted the attention of Mr. Landers. Landers called plaintiff on the telephone and made inquiry about this property. Plaintiff described the farm, told Landers the price, and gave him directions as to its location. Landers in-

spected the farm, and a few days thereafter plaintiff called at Landers' home. He asked Landers how he liked the farm. Landers replied that he did not like it because it was too far from the highway, and had no outbuildings. Landers said he would not consider the farm at any price. Plaintiff then left, but a few minutes later returned and told Landers that he would be glad to submit an offer to the owner. Landers, in reply, again said he was not interested and would not have the farm at any price. Plaintiff then left and did nothing thereafter to induce Landers to change his mind. Thereafter, Mr. and Mrs. Moss bought the property. Their attention was directed to the property by Mr. Williams, a real estate agent in Bowling Green. Several meetings were had between Mr. Williams and Mr. Moss at which the purchase and sale of this property was discussed. Plaintiff did nothing to bring these parties together, nor did he take part in any of these negotiations. In fact, plaintiff had no contact whatever with the Mosses at any time. All the negotiations were between defendant and Mr. Moss. There was no competent evidence received or offered that Landers in his negotiations with plaintiff was acting for the Mosses, or that the purchase of the farm was a joint venture between Landers and Moss. Such a finding would rest purely on speculation and conjecture. A finding that plaintiff's efforts influenced Landers to persuade Moss to buy the property would also rest on pure speculation. And, even if plaintiff's efforts did have that effect, it would not justify a finding as a matter of law that plaintiff's efforts were the procuring cause.

It is not enough that plaintiff's act is one of a chain of causes producing the sale. It must be shown that the act of plaintiff was the efficient procuring cause of the sale. Williams v. Mashburn, Mo.App., 37 S.W.2d 478; Gamble v. Grether, 108 Mo.App. 340, 83 S.W. 306; Crain v. Miles, 154 Mo.App. 338, 134 S.W. 52; Kyle v. Kansas City Life Ins. Co., 356 Mo. 331, 201 S.W.2d 912. Plaintiff failed to show an unbroken chain of causation necessary to satisfy the requirement of procuring cause, to wit, that plaintiff's acts in their natural sequence, unbroken by any new and independent cause, resulted in the sale.

There is no suggestion, either in the pleadings or proof, that defendant, after entering into the special contract with plaintiff, did or said anything which could be construed as a waiver of his right to insist upon the strict terms of the agreement. Plaintiff did not effect a sale within the terms of that contract. There was no plea of fraud, and no sufficient evidence to justify a finding thereof had it been pleaded. Plaintiff was not the procuring cause of the sale. Gamble v. Grether, 108 Mo. App. 340, 83 S.W. 306; Westerman v. Peer Inv. Co., 197 Mo.App. 278, 195 S.W. 78.

Our conclusion is that, on the record made, the trial court should have directed a verdict for defendant. However, since the verdict and judgment were for the right party, said judgment is affirmed.

MATTHES, J., and SAM C. BLAIR, Special Judge, concur.