Paul ZABOL, Plaintiff-Respondent,

v.

Manuel LASKY, Defendant-Appellant.

No. 59998.

Supreme Court of Missouri,
En Banc.

Sept. 12, 1977.

Roberts P. Elam, Clayton, for plaintiff-respondent.

Alan C. Kohn, St. Louis, for defendant-appellant.

FINCH, Judge.

Plaintiff sought by this action in quantum meruit to recover $210,500 as a broker's commission allegedly due for services rendered in connection with the sale of a building at 121 S. Meramec, Clayton, Missouri, to the Seven-Up Company. The case was submitted on the theory of a contract implied in law—i.e., the rendition of beneficial services with respect to the sale of said building with the expectation of compensation and the acceptance of the beneficial services by defendant when he knew or should have known that compensation would be expected.[1] There was a jury verdict for plaintiff in the sum of $60,206, and defendant appealed to the Missouri Court of Appeals, St. Louis District, which reversed. On application we ordered the case transferred, and we now decide it as though here on direct appeal. We reverse.

Defendant contends that plaintiff did not make a submissible case and that for this reason the trial court erred in denying his motion for a directed verdict at the close of all the evidence. He bases this contention on two grounds. In the first place, he says that there was not sufficient evidence from which a contract to pay for services in connection with sale of the building could be implied. Next, he asserts that the evidence was not sufficient to show that acts of plaintiff referable to ultimate sale of the building were the efficient or procuring cause of the sale. The court of appeals reversed on the basis of defendant's first contention, holding that the evidence established that plaintiff had been employed to lease space in the building, not to sell it, and that there was no evidence that he had performed any services for defendant in connection with sale of the building. For those reasons, the court of appeals concluded that no implied contract could be inferred to authorize a judgment in quantum meruit for services in connection with sale of the building and did not reach the second contention.

Plaintiff's application for transfer was predicated upon an apparent conflict between the court of appeals' decision and previous decisions of this court[2] and other appellate courts regarding the sufficiency

---

1. The distinction between a contract implied in fact and one implied in law is stated in *Bennett v. Adams*, 362 S.W.2d 277, 280–81 (Mo.App. 1962).

2. This case was before this court previously for a ruling on the propriety of the action of the trial court in directing a verdict for defendant at the close of plaintiff's opening statement. *Zabol v. Lasky*, 498 S.W.2d 550 (Mo.1973). In the course of that opinion, it was stated, although not necessary to the opinion, that "[w]hether there resulted a factual situation whereby under the law of quantum meruit appellant was entitled to compensation would ordinarily be a jury question." That statement should not be considered as indicating that a trial court may not consider whether there was sufficient evidence introduced to make a sub-

missible case in an action in quantum meruit. The prior *Zabol* opinion involved only the issue of whether the court properly directed a verdict at the end of plaintiff's opening statement. The court held that the petition was sufficient to state a claim upon which relief could be granted and that since plaintiff in his opening statement had not made admissions which affirmatively demonstrated as a matter of law that he was not entitled to recover and had not stated or admitted that the facts he did relate were all he would prove, the court had erred in directing a verdict on the basis of the opening statement. As the facts related herein indicate, the evidence now before us differs significantly from the allegations of the petition as summarized at 498 S.W.2d at 554.

of evidence required to support a submission to the jury on a quantum meruit theory. However, after briefs and argument in this court, it became clear that in order to support his theory for recovery, the plaintiff, as a broker, was required to establish not only an implied contract to pay for his services but also that his acts with reference to the ultimate sale were the efficient or procuring cause thereof. We have concluded that even if we should hold that plaintiff did offer sufficient evidence from which the jury could infer a contract to pay the plaintiff if he produced a buyer rather than a lessee for the building, we would still be compelled to reverse the judgment on the basis that the plaintiff clearly failed to offer sufficient evidence from which the jury could infer that his acts were the ultimate or procuring cause of the sale under the standards long recognized in the appellate decisions of this state. It would therefore serve no useful purpose for us to decide the question of whether the evidence of services rendered was sufficient to make a submissible case for the jury on the existence of an implied contract, and we do not do so.

The record contains a great deal of inconsistent testimony concerning the existence of such an implied contract and, in view of our disposition, it would only add length and create confusion to attempt to relate all of the evidence relating to that difficult question in this opinion. Instead, only the facts essential to the determination of whether, even assuming an implied contract, the plaintiff was the procuring cause of the sale will be summarized.

In May 1963 defendant and his wife were in the process of constructing an office building for investment purposes in Clayton. The building was ten stories high, each floor containing approximately 10,000 square feet of rental space, and there were four floors below grade, each containing approximately 25,000 square feet of parking space. The exterior of the building was practically completed at that time, but the interior was unfinished and there were no tenants in the building.

Defendant Lasky began looking for someone to aid him in leasing space in the building. He met with plaintiff, a licensed real estate broker with several years experience, and orally contracted with him to take charge of the leasing operation. Plaintiff immediately moved from his downtown office to defendant's office next to the building under construction. He was to work practically full time and was to receive a guaranteed draw of $200 per week which was to be offset against commissions on each lease he obtained of 1½ per cent of the gross amount of the lease, plus an override of ½ per cent on any lease obtained in conjunction with another employee of defendant. As explained by defendant, plaintiff's commission would be calculated by applying the percentage agreed upon to the number of square feet leased times the price per square foot times the length in years. This was less than the usual commission for such services but the arrangement contemplated that defendant, rather than plaintiff, was to pay for such expenses as advertising and producing brochures.

Plaintiff commenced work in May 1963. He and defendant worked together to plan a program after which plaintiff undertook to carry it out. Both attended a restaurant convention in Chicago where they attempted to generate an interest in establishing a restaurant on the top floor of the building. Plaintiff contacted various insurance companies and also undertook to contact all those listed in a Chamber of Commerce book which he and defendant thought would contain the firms which were likely prospects. Plaintiff first would make a telephone contact with the company and, if any interest was shown in renting space, he followed up with a letter and brochure. If that resulted in an expression of interest, he undertook to make appointments for personal visits. He kept a card record of those contacts where any interest was shown in leasing, listing the person contacted and the status of the effort as to such company.

One of the businesses contacted by the plaintiff was the Seven-Up Company. Af-

ter various preliminary contacts there, he talked by telephone to Howard E. Ridgeway, executive vice-president and the then acting president of the company. Plaintiff testified that he explained that he wanted to talk to Ridgeway about the Seven-Up Company leasing the building and that an appointment was made for Mr. Ridgeway to look at the building on July 16, 1963. Mr. Ridgeway, in a deposition which plaintiff introduced,[3] testified that he told plaintiff when he called that Seven-Up was not interested in leasing but, when plaintiff insisted, he agreed to look at the building.

On July 16, 1963, Ridgeway met plaintiff and defendant and toured the unfinished building, climbing the stairs to the top floor to permit Ridgeway to see the view from that point. There is variance in the testimony as to what occurred at that point. Plaintiff testified that he had been talking to Ridgeway about leasing the building but that when they reached the top, Ridgeway indicated an interest in buying. Both plaintiff and defendant responded that the building had been erected as an investment and that defendant was interested only in leasing, not selling. Contrary to what plaintiff stated, Ridgeway testified that a sale or offer to purchase was not discussed at the meeting on July 16. Defendant also testified that he did not remember any discussion of a sale at that meeting; but in testifying about a second meeting a few weeks later at Ridgeway's office, he stated that Ridgeway "again asked me whether my building was for sale," thereby indicating that there had at sometime been a prior conversation about a possible sale.

The parties agreed that at the July 16 meeting various possible leasing plans involving different portions of the building were proposed. At the end, it was decided that plaintiff would prepare and submit on behalf of the defendant various written proposals to Ridgeway. These were delivered to him by plaintiff and defendant on August 6, 1963.

There also is conflicting testimony regarding what transpired at the August 6, 1963, meeting of plaintiff, defendant and Ridgeway at the latter's office. Plaintiff testified that Ridgeway indicated that he was leaning toward purchase but that he would not rule out the possibility of leasing and would take it up with the powers that should be consulted within the company. Plaintiff further testified that the question of a sale of the building was discussed at the meeting but that the defendant said he was not interested in selling and only wanted to lease the building.

Ridgeway testified that a discussion on leasing took place at the August 6 meeting but that he reiterated that Seven-Up was not interested in leasing. He described his response as an outright rejection of the lease proposition and said that there was no bargaining area left open at all. He also stated that either at that meeting or in a subsequent telephone call from defendant a few days later, he had said, "I don't suppose you want to sell the building?" and defendant replied that he didn't think so but would give it some thought. Ridgeway testified that defendant called him a week or so later and said he would consider selling. Ridgeway asked how much defendant wanted and was told $3,700,000. Ridgeway then told defendant that Seven-Up was not interested and that they were going ahead with their plans to build on their own property on Delmar.

Defendant testified that at the August 6 meeting he had quoted the price of $3,700,-000 but that he had previously stated that the building was not for sale and that the quoted price was only in response to an inquiry by Ridgeway in which he said, "Knowing the size of your building and so forth, what would a building like this sell for or what would be a price if you decided to sell?" Defendant replied that the price would be in the neighborhood of $3,700,000.

Plaintiff testified that after the meeting in Ridgeway's office on August 6, defendant wanted him to continue calling on Seven-Up to try to arrange a lease. He did

3. Mr. Ridgeway died shortly before this case was tried in 1974, and plaintiff introduced as part of his case the deposition of Ridgeway which had been taken in 1965.

this, but shortly thereafter Ridgeway was getting tired of the contacts and told him on the telephone, "We are having a major meeting in June 1964 at which time I will call you back and let you know what decision we make." Plaintiff wrote on his followup card, "to call back end of June 1964," but, in fact, he did not call back and Ridgeway did not call him. He had no further conversation with Ridgeway or anyone else with the Seven-Up Company.

In October 1963, plaintiff terminated his employment with defendant (his last draw was October 10, 1965). At that time, plaintiff had not secured any leases and there were no tenants in the building. There was one likely prospect, a brokerage firm, and plaintiff and defendant agreed that if that lease materialized, plaintiff's commission thereon would be offset by the draw he already had received. Defendant also advised plaintiff that he could keep on looking for tenants, and if he was successful, defendant would pay him the full customary commission of six per cent on such leases. However, plaintiff went to work for someone else and did nothing with respect to leasing or selling the Lasky building after terminating his employment in October 1963.

Ridgeway testified in his deposition that he could recall no telephone call from plaintiff in which he stated that Seven-Up would need time to make up its mind about the 121 S. Meramec building. He went on to explain that during this period they had been besieged by people wanting Seven-Up to lease space, offering what the people calling thought were very favorable propositions, and that, in every instance, those propositions were turned down because they had their own property and by that time had had core drills made, had made plans to wreck one of the old buildings, had moved a warehouse and had started architectural work in connection with the building to be built on Delmar.

Ridgeway further testified that it wasn't until the summer of 1964 that the possibility of another possible location again came up and that the question arose at that time as a result of other people in Clayton trying to figure out some way that they could get the Seven-Up Company to move to Clayton. He said there were all kinds of propositions made to them, including either building a building for them or leasing ground to them, and that, as a result, they looked at various properties in Clayton. Up to that time, however, they had not terminated their plans to build their own building at 1300 Delmar.

Ridgeway testified that in the course of these discussions in 1964 about possibly moving to Clayton he consulted Mr. Sidney Studt, a longtime personal friend, who was an experienced real estate broker in Clayton. He had several meetings with Studt who submitted two or three possible proposals for property other than the 121 S. Meramec building. Ridgeway then requested and received from Studt extensive specific information concerning the S. Meramec building, including the structure, foundation, and amount of loan outstanding thereon. These services were rendered by Studt to Ridgeway as a personal favor and without any payment or fee. Seven-Up then decided to see if it could buy the S. Meramec building and Ridgeway asked Studt to perform as an agent on that basis but with Seven-Up to pay no commission or fee, Studt's compensation to be paid by the seller.

Three successive forms of contracts for sale were drawn in Studt's office before a contract acceptable both to Lasky and to Seven-Up was agreed upon. These contracts named a Robert W. Simpson as purchaser. Lasky did not know that Simpson was acting as a straw party for Seven-Up until after a contract of sale had been executed. The contract called for a total purchase price of $3,525,000 with a commission of $100,000 to be paid by the seller to Studt. In addition, sellers were to convey an adjoining piece of property owned by them for $75,000. The contract was executed November 20, 1964, and the sale closed January 5, 1965. Shortly after November 20, plaintiff learned from a newspaper article that the S. Meramec building had been sold

to Seven-Up. He then called defendant and inquired about a commission, but defendant took the position that plaintiff was not entitled to a commission and this suit followed.

The rule is well established in Missouri that, unless provided otherwise by the terms of a broker's employment, he must prove, in a suit to recover a commission on a sale, that his acts with reference to that sale were the efficient or procuring cause of the sale. *Taylor v. Vestal,* 304 S.W.2d 820 (Mo.1957); *Barnum v. Hutchens Metal Products, Inc.,* 255 S.W.2d 807 (Mo.1953); *Rogers v. McCune,* 283 S.W.2d 872 (Mo.App. 1955); *Real Estate Enterprises v. Collins,* 256 S.W.2d 286 (Mo.App.1953). See also 12 C.J.S. Brokers § 91. In analyzing the evidence in this case to determine whether plaintiff's evidence was sufficient to make a submissible case on whether his acts were the efficient or procuring cause of the sale to the Seven-Up Company, there are certain rules which govern our consideration of the testimony introduced. We, of course, must follow the well established rule that we consider the evidence and the reasonable inferences therefrom in the light most favorable to plaintiff, disregarding defendant's evidence unless it aids plaintiff's case. *Woodford v. Illinois Central Gulf Railroad,* 518 S.W.2d 712, 715 (Mo.App.1974). More importantly in this case, we must apply the rule that plaintiff is bound by his own testimony, unless corrected or explained, and that a party who has the burden of proof on an essential issue is bound by the uncontradicted testimony of his own witnesses, unless there are facts from which the jury may draw a contrary inference. *Taylor v. Vestal,* 304 S.W.2d 820, 823 (Mo. 1957); *Barnum v. Hutchens Metal Products, Inc.,* 255 S.W.2d 807, 808 (Mo.1953). An explanation of the application of the rule was given in *Draper v. Louisville & Nashville Railroad,* 348 Mo. 886, 156 S.W.2d 626, 633–34 (1941), as follows:

" 'If A. put B. on the stand, and prove by him a certain state of facts, this does not preclude A. from putting C., D. or E. on the stand, and proving a different state of facts; but if A. puts B. on the stand as his only witness to prove a fact, and does prove it, then he is precluded from impeaching B., or from otherwise inviting the jury to disregard B.'s testimony. He may not avoid his dilemma in that way.' [Citations omitted] . . . [S]ince a plaintiff has the burden of proof, if he puts on only one witness to prove a fact and his positive statement on direct testimony is that the fact is definitely one way, then the plaintiff cannot have the jury disregard his only direct evidence on the point and find that the fact is exactly the opposite on the basis of inferences from circumstances also stated in the testimony of this same witness. This is not so much a matter of being bound by what his witness says as it is a failure of proof of an essential fact."

Plaintiff elected to introduce the deposition of Mr. Ridgeway, thereby making him plaintiff's witness. Ridgeway unequivocally testified that he had no thought or intention of buying the S. Meramec building during 1963 while plaintiff was employed by defendant and that he had clearly so stated. The matter had not been postponed. He also stated that he had proceeded in 1963 and the first part of 1964 with steps looking toward construction by the Seven-Up Company of a building on its own lot on Delmar. He testified that after August or early September 1963 he had no contact with or communication from plaintiff or defendant about the building which defendant owned and that he became interested in Clayton in 1964 only because various persons there began to apply pressure on Seven-Up and its officers to locate in Clayton. At that time there was discussion of others building a building for Seven-Up or leasing ground to the company or other possible arrangements. As a result of this new effort and persuasion, Ridgeway contacted his longtime friend, Sidney Studt, as previously related, and began to explore various proposals and eventually began to consider the possibility of acquiring the S. Meramec building of defendant Lasky.

As indicated at the outset of this opinion, much of the controversy on appeal centered upon whether the defendant had impliedly contracted to pay the plaintiff if he was successful in procuring a sale rather than a lease of the building. However, even assuming an implied contract to pay for procuring a sale, the unequivocal and unrefuted testimony of plaintiff's witness was that there was a total cessation in 1963 of all efforts to sell the building to Seven-Up and an abandonment by Seven-Up of the idea, if any be found to have existed, of buying the Lasky building. It refuted the idea of a mere suspension of negotiations in 1963. Plaintiff's evidence, by way of Ridgeway's testimony, was that the purchase made in the fall of 1964 was the result of the effort and pressure by others in Clayton in 1964 to persuade Seven-Up to locate there.

■ Under the rule stated in *Draper, supra*, plaintiff was bound by this uncontradicted testimony of his own witness, and he was not entitled to have the jury disregard his only direct evidence on this question and find the facts contrary to such evidence. Under *Draper*, the testimony of Ridgeway would be conclusive on plaintiff as to a lack of procuring cause. It follows that plaintiff's evidence failed to make a submissible case on the issue of whether his acts referable to ultimate sale of the building were the efficient or procuring cause of the sale and that a verdict for defendant should have been directed. Such conclusion is consistent with various decisions of the appellate courts of this state.

In *Barnum v. Hutchens Metal Products, Inc.*, 255 S.W.2d 807 (Mo.1953), defendants owned a large manufacturing plant at Lamar. In the fall of 1949, defendants mailed copies of a circular describing their plant and equipment to various brokers, including the plaintiff. Plaintiff testified that in early March 1950, he had been in contact with one Doyle, a corporate officer of a firm in Kansas City, concerning the company's need for additional space. He showed various buildings and lots but they were unsatisfactory. Doyle remarked that if they had to move out of town, they might be better off moving to some small town adjacent to Kansas City. Plaintiff remembered the circular from defendants, and asked Doyle for permission to make further inquiry about the availability of the building at Lamar. On inquiry, he learned it was available for sale or lease, and plaintiff, on March 8, 1950, advised defendants that Doyle's company was plaintiff's prospective purchaser. On March 10, 1950, plaintiff wrote defendants advising that Doyle was out of town for a week but upon his return, plaintiff would advise defendants of Doyle's interest. On Doyle's return, plaintiff conveyed the information received from defendants, and Doyle said he would discuss it with his fellow officers and plaintiff was to call back. On April 1, 1950, Doyle advised plaintiff that his fellow officers felt there would be difficulty in getting families of key personnel to move to Lamar and that the matter should be dropped for the time being; but if a change was made, Doyle would contact plaintiff. Meanwhile, plaintiff had no further contact with defendants other than his inquiry for additional information in early March. On June 18, 1950, plaintiff learned that the plant at Lamar had been sold to Doyle. He demanded a commission of defendants, but they refused to pay and plaintiff sued.

As a part of his case, plaintiff introduced the deposition of E. A. Mabes, another broker. In that deposition, Mabes testified that he had received the circular about the Lamar property and had mentioned it on several occasions to Doyle but aroused no interest until late April or early May because Doyle had not wanted to leave Kansas City because of the wishes of his personnel. When Doyle finally did decide he had to move because he couldn't find anything in Kansas City, Mabes convinced him that he should look at the Lamar plant. He flew down and looked at the plant and then had other plant personnel and his wife meet him there. A deal was made and the property purchased, defendants paying Mabes a commission. On this testimony, defendants received a directed verdict and plaintiff appealed.

The court recognized the general rules for payment of brokers' commissions, noting that if the broker is the procuring cause, he is entitled to a commission even if the owner ultimately closes the deal or if another broker is employed to consummate the transaction. The court also stated that the question of whether the broker was a procuring cause ordinarily is a question for the jury. However, the court noted, where submissibility is in issue, the party with the burden of proof on an essential issue is bound by the uncontradicted, though adverse, testimony of his own witness unless there are facts from which the jury may draw a contrary inference. *Id.* at 808. The court determined on the issue of procuring cause that the plaintiff vouched for the creditability of Mabes' testimony and, because it was not contradicted by any other witness, it could be considered as true. Consequently, the court found that by reason of Mabes' testimony, the plaintiff's evidence established that there was no factual basis from which to infer that Doyle really became interested in purchasing the property prior to the time Mabes insisted Doyle visit Lamar. The plaintiff's evidence established that Mabes was the procuring cause and the directed verdict was proper.

In *Real Estate Enterprises v. Collins*, 256 S.W.2d 286 (Mo.App.1953), plaintiff had the exclusive agency to sell a property during a term ending August 9, 1949. During the preceding months, plaintiff attempted to induce the Carraras to buy the property for $35,000, but was unsuccessful. Plaintiff did submit to defendants an offer on behalf of the Carraras for $25,000 but that was promptly refused by defendants. Plaintiff attempted to persuade the Carraras to increase their offer but was informed they were no longer interested. Plaintiff then ceased to advertise defendants' property. Later, after the exclusive agency was terminated, defendant owners called on the Carraras and renewed their interest in the property, which they subsequently sold to the Carraras in late October.

It was clear from the evidence that the Carraras had been induced by plaintiff to become interested in the property during the term of plaintiff's contract and, hence, that services had been rendered. If the interest induced by plaintiff had been the procuring cause of the sale, plaintiff would have been entitled to a commission even though the sale was not consummated until after the termination of the agency. The issue was whether plaintiff's efforts were the procuring cause of the sale.

Plaintiff's case was submitted to the jury which rendered a verdict for defendant. In reviewing the case on appeal, the court of appeals held that the trial court should have directed a verdict for defendant. This was not dictum because the court found that an instruction challenged by plaintiff was erroneous and on that basis would have granted a new trial but for its conclusion that the evidence warranted a directed verdict. In deciding the case, the court declared, 256 S.W.2d at 289, that for one's services to be the procuring cause of a sale,

"it is essential that his initial efforts in calling attention to the property shall have set in motion a series of events which, without a break in their continuity, and without interruption in the negotiations, eventually culminated in the sale. But where there is a definite break in the continuity of the negotiations amounting to an abandonment of the deal, and new forces thereafter enter which bring about a renewal of the negotiations and themselves become the effective cause of the sale, the initial efforts may not then be regarded as the proximate procuring cause so as to be the foundation on which to predicate a right to a commission. *Young v. Stecher Cooperage Works*, 259 Mo. 215, 168 S.W. 611; *Westerman v. Peer Inv. Co.*, 197 Mo.App. 278, 195 S.W. 78; *Good v. Robinson*, 194 Mo.App. 453, 184 S.W. 955; *Smith v. Allgier*, 234 Mo.App. 392, 135 S.W.2d 43."

In *Rogers v. McCune*, 283 S.W.2d 872 (Mo.App.1955), plaintiff brought an action in quantum meruit for recovery of a broker's commission on the sale of land under a non-exclusive contract in which plaintiff was to receive any commission he could

obtain over and above $80 net per acre to defendant. Plaintiff advertised the property and, as a result, one Landers made inquiry. Plaintiff was too busy to show him the farm that day but directed Landers to the farm and asked Landers to inform defendant that he had been sent by plaintiff. Landers inspected the farm but encountered only defendant's wife, and he did not tell her he had been sent by plaintiff. Plaintiff called at Landers' home a few days later and asked how he liked the farm. Landers replied that he did not like it and would not consider it at any price. Plaintiff had quoted him a price of $100 per acre but offered to submit a lower offer to defendant in Landers' behalf. Landers again said he was not interested and would not have the farm at any price. Plaintiff left and thereafter did nothing to induce Landers to change his mind.

Subsequently, Landers went to the county where defendant's land was located, accompanied by his father-in-law, Albert Moss, and his brother-in-law, Wilson Moss. They contacted a real estate agent who showed them another farm, but they were not interested therein. The agent indicated he had other properties and when the three returned a week later, he took them to see defendant's farm. Defendant was not present, and Landers said nothing at the time about having previously seen the farm. The Mosses subsequently purchased the farm for slightly less than $80 per acre. Defendant met Landers only after the contract was signed.

The jury rendered a verdict for defendant and plaintiff appealed. On appeal, the court held that a judgment should have been directed for defendant on the issue of procuring cause. It based its decision on the ground that plaintiff had no contact with the Mosses, that there was no evidence that Landers was acting as agent for Mosses and that it would be pure speculation to find that plaintiff's efforts induced Landers to persuade the Mosses to buy. The court said, "Plaintiff failed to show an unbroken chain of causation necessary to satisfy the requirement of procuring cause, to wit, that plaintiff's acts in their natural sequence,

unbroken by any new and independent cause, resulted in the sale." *Id.* at 878.

We have examined the cases cited by plaintiff on this issue but find them to be distinguishable. They do not justify a decision herein that plaintiff made a submissible case on the issue of procuring cause of the sale.

Judgment reversed.

All concur.